# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

The Estate of PATRICK K. KILROY,  )
RENEE KILROY, as Executor for  )
the Estate and Individually, and  )
ALEXA KILROY,  )
      Plaintiffs,  )
  v.  ) **C.A. No. N23C-01-055 FJJ**
         )
ANDRA M. POPESCU, M.D.,  )
Individually; REGIONAL MEDICAL  )
GROUP, LLC d/b/a Regional Medical  )
Group, a Delaware Limited Liability  )
Company; and CHRISTIANA CARE  )
HEALTH SERVICES, INC. d/b/a  )
Christiana Hospital, a Delaware  )
Corporation,  )
      Defendants.  )

Submitted: March 11, 2026
Decided: March 17, 2026

## OPINION AND ORDER
*on the Parties Motions in Limine and
Defendants' Motion for Summary Judgment*

*Bartholomew Dalton, Esquire and Andrew C. Dalton, Esquire*, Dalton & Associates, PA, Wilmington, Delaware, *Attorneys for Plaintiffs.*

*Colleen Shields, Esquire and Jessica L. Reno, Esquire,* Eckert Seamans Cherin and Mellott, LLC, Wilmington, Delaware, *Attorneys for Defendant Christiana Care Health Services, Inc.*

*Maria R. Granaudo, Esquire,* Burns White, LLC, Wilmington, Delaware, *Attorney for Defendants Andra M. Popescu, M.D., and Regional Medical Group, LLC.*

**Jones, J.**

Plaintiffs, Renee Kilroy, on behalf of herself and as a representative of the Estate of Patrick Kilroy ("Decedent"), and Alexa Kilroy (collectively "Plaintiffs"), bring a medical negligence action against Andra Popescu, M.D. ("Dr. Popescu"), Regional Medical Group, LLC ("Regional Medical") and Christiana Care Health Services, Inc. ("CCHS"). It is alleged that Defendants were negligent when there was a delay in the cardiac catheterization of Decedent which Plaintiffs claim led to his death in May of 2021. The parties have filed numerous Motions in Limine covering a range of topics. This is the Court's rulings on these motions.

## FACTS

On the night of May 2, 2021, Decedent presented to CCHS's Middletown Emergency Department complaining of shortness of breath, shoulder pain and lower extremity swelling.[1] He had been experiencing the lower extremity swelling for 6-7 weeks prior and had a history of type 2 diabetes.[2] Decedent was recently seen by a vascular surgeon and was referred to cardiology but had yet to be seen by that department.[3] While at the emergency department, Decent was diagnosed with Non-ST Elevated Myocardial Infarction (NSTEMI) and Congestive Heart Failure.[4] At Decedent's request, he was seen by Dr. Popescu.[5] Dr. Popescu is a cardiologist and

---

[1] Docket Item ("D.I.") 99, at 1; *see also* D.I. 81, at 2.
[2] D.I. 81, at 2.
[3] D.I. 81, at 2.
[4] D.I. 99, at 1; *see also* D.I. 81, at 2.
[5] D.I. 99, at 1-2; *see also* D.I. 81, at 2-3.

a member of Regional Medical; she is not an employee of CCHS.[6]  However, she does treat patients at CCHS and has a CCHS badge.[7]  Decedent had never been treated by Dr. Popescu before but he was familiar with her through her former medical partner.[8]

On May 3, 2021, Dr. Popescu assessed Decedent for the first time at his bedside at CCHS.[9]  Following this interaction, Dr. Popescu admitted Decedent into the CCHS cardiac unit and scheduled a cardiac catheterization to take place the next day.[10]  On May 4 at 12:32pm, Lauren Zastrow, PA-C, canceled the cardiac catheterization and texted Dr. Popescu to notify her of the cancellation.[11]  Dr. Popescu rescheduled the catheterization for the following day.[12]  After his catheterization was delayed multiple times on May 5, Decedent suffered a ventricular fibrillation cardiac arrest around 12:45pm.[13]  Although resuscitation efforts were performed for almost an hour, they were unsuccessful and Decedent was pronounced dead at 1:35pm.[14]

**THE MOTIONS**

1. **Defendants Regional Medical and Dr. Popescu's Motion to Preclude Life Expectancy Charts**

---

[6] D.I. 81, at 2.
[7] D.I. 99, at 5-6.
[8] D.I. 81, at 2-3.
[9] D.I. 99, at 1-2; *see also* D.I. 81, at 3.
[10] D.I. 99, at 2; *see also* D.I. 81, at 3.
[11] D.I. 79, at 2; *see also* D.I. 103, at 2.
[12] D.I. 103, at 2; *see also* D.I. 81, at 3.
[13] D.I. 103, at 2; *see also* D.I. 81, at 3.
[14] D.I. 81, at 3; *see also* D.I. 103, at 2.

3

Defendants Regional Medical and Dr. Popescu filed a Motion in Limine to preclude anticipated standard life expectancy charts from trial.[15]  In making their arguments, Defendants cite Delaware Rules of Evidence ("DRE") 401, 402, 403 and *Spencer v. Goodill*.[16]  Defendants maintain that because Plaintiffs have not provided expert testimony as to the reasonableness of the standard life expectancy charts in light of Decedent's comorbidities the charts would be irrelevant.  Plaintiffs have filed no opposition to this motion.  Accordingly, the Motion in Limine as to the life expectancy charts is **GRANTED**.  Any proof of Decedent's life expectancy will have to be proved in ways beyond the life expectancy charts.

### 2. Defendants Regional Medical and Dr. Popescu's Motion to Preclude Evidence of Decedent's Income

Defendants Regional Medical and Dr. Popescu have filed a Motion in Limine to preclude evidence of Decedent's income, reputation as a businessman, and all other matters related to a claim for loss of future earnings.[17]  Defendants contend that Plaintiffs are no longer pursuing a claim for loss of future earnings and are no longer producing an economics expert to testify as to any lost income.

Plaintiffs confirmed they are not seeking a claim for loss of future earnings or earning capacity, nor are they calling any expert witness in this capacity.[18]  Rather, they are going to call Decedent's non-expert friends who intend to testify as to his

---

[15] D.I. 75.
[16] *Spencer v. Goodill*, 2009 WL 5177154 (Del. Super. Ct. Dec. 4, 2009).
[17] D.I. 73.
[18] D.I. 98, at 4.

4

character, the nature of his relationships and the magnitude of loss felt by Decedent's family resulting from his death. There is no plan for these witnesses to testify as to income figures, earnings or financial calculations.[19]

Accordingly, this Motion in Limine is **GRANTED IN PART** solely as to testimony on Decedent's income. However, the witnesses are otherwise free to testify on those matters for which Plaintiffs have proffered these witnesses with the understanding that any testimony must be related to losses that Plaintiffs are entitled to recover.

### 3. Defendant CCHS's Motion in Limine to Preclude Vicarious Liability

Defendant CCHS has filed a Motion in Limine to preclude vicarious liability claims for the treatment rendered by Dr. Popescu to Decedent.[20] While CCHS acknowledges that a hospital can be held liable for the actions of a non-employee under the "apparent agent" exception,[21] CCHS claims Decedent's familiarity with Dr. Popescu shows he knew she was not employed by the hospital. Plaintiffs respond that Decedent was never aware of Dr. Popescu's employment status in relation to CCHS.[22]

In *Vick v. Khan*, the Court briefly explained the "apparent agency" exception for hospitals and physicians:

---

[19] D.I. 98, at 3.
[20] D.I. 81.
[21] D.I. 81, at 4-5 (citing *Fulton v. Quinn*, 1993 WL 19674, at *4 (Del. Super. Ct. Jan. 12, 1993)).
[22] D.I. 99

[A] physician who is an independent contractor may, nonetheless, be considered an agent of the hospital with respect to a patient. *The exception is very fact specific* and has been articulated as follows: "One who represents that another is his servant or agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused [by] a lack of care or skill of the one appearing to be a servant or other agent as if he were such."

In order to establish an "apparent agency" relationship between Dr. Khan and Bayhealth, the Plaintiffs must first establish that Bayhealth represented or held out Dr. Khan as an agent to [Plaintiff] and, secondly, that [Plaintiff] reasonably relied on that representation. The burden is on the plaintiff to establish such a relationship.[23]

The Court went on to outline "two fact situations in which the law is clear surrounding an agency relationship in a medical malpractice suit."[24] The first example occurs when "a sick or injured person consults his own doctor for diagnosis and treatment; the doctor recommends hospital care; thereafter the doctor treats him in the hospital; the patient pays all expenses, including fees directly to the doctor. In this situation …. [t]he hospital is not liable for malpractice by the doctor."[25] The second occurs when a patient arrives at a hospital and is treated by a doctor employed there.[26] Because their factual scenario aligned with the first example, the *Vick* Court held the defendants were entitled to judgment as a matter of law.[27]

---

[23] *Vick v. Khan*, 2019 WL 2177114, at *10 (Del. Super. Ct. May 17, 2019) (footnotes omitted) (emphasis added).
[24] *Id.* (citing *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970)).
[25] *Id.* (quoting *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970)) (internal quotations omitted).
[26] *Id.* (citing *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970)).
[27] *Id.* at *10-11.

The Vick Court made it clear that whether apparent agency exists in this context is a "very fact specific." In the instant case, there is a question of fact as to whether CCHS held Dr. Popescu out as its agent and whether Plaintiff reasonably relied on that representation. Here, Decedent arrived at CCHS for treatment, asked for Dr. Popescu and was subsequently treated by her at CCHS's facilities. He had never been treated by Dr. Popescu prior to this interaction nor is there anything in the record indicating Decedent was ever informed that she was not an employee of the hospital. On this record there is a factual dispute that must be determined by a trier of fact.

Accordingly, this Motion in Limine as to vicarious liability is **DENIED**.

### 4. Defendant CCHS's Motion in Limine to Preclude Direct Claims of Negligence

Defendant CCHS has filed a Motion in Limine to preclude direct claims of negligence against it.[28] CCHS asserts that neither of Plaintiffs' experts have testified as to any violation of the standard of care or causation by CCHS itself or its catheterization department in violation of 18 *Del.C.* §6853. Rather, all the complained of actions or omission were taken by Dr. Popescu herself. Plaintiffs maintain there are still factual disputes as to the actions taken by CCHS and the catheterization lab.[29]

---

[28] D.I. 83.
[29] D.I. 100.

18 *Del.C.* §6853(e) states in pertinent part "[n]o liability shall be based upon asserted negligence unless expert medical testimony is presented as to the alleged deviation from the applicable standard of care in the specific circumstances of the case and as to the causation of the alleged personal injury or death."[30]  Both of Plaintiffs' experts plainly state that they either have not reached an opinion as to the cardiac catheter department at CCHS[31] or that they saw no deviation in the standard of care by that department.[32]  Plaintiffs' assertion that there are disputed facts as to what roles different actors played in the cancellation of the catheterization cannot overcome the lack of an expert opinion alleging a deviation from the standard of care by CCHS itself.[33]

Accordingly, the Motion in Limine to preclude direct claims against CCHS is **GRANTED**.

### 5. Defendants' Motion to Exclude the Testimony of Dr. Mena-Hurtado

Plaintiffs have proffered Dr. Mena-Hurtado as an expert witness. Dr. Mena-Hurtado is an Interventional Cardiologist. Through an expert disclosure and a deposition, Dr. Mena-Hurtado has opined that it was below the standard of care for Patrick Kilroy to not have undergone a cardiac catheterization within 24 hours of presentation and, had Kilroy undergone the cardiac catheterization within 24 hours,

---

[30] *See also Burkhart v. Davies*, 602 A.2d 56, 59 (Del. 1991).
[31] D.I. 83, Ex. E (Dep. of Dr. Carlos Mena-Hurtado), at p. 180.
[32] D.I. 83, Ex. D (Dep. of Dr. Joel Gore), at p. 100.
[33] *Burkhart*, 602 A.2d at 59-60 (noting "a plaintiff's claim for medical malpractice *must* be supported by expert medical testimony" and granting summary judgment because the plaintiffs "failed to adduce any expert medical testimony.").

he would have received appropriate intervention which would have prevented his cardiac arrest and death.[34] All Defendants have moved to exclude Mena-Hurtado on the grounds that the doctor failed to define the standard of care consistent with Delaware law.[35] In addition, Defendants move to exclude the doctor's testimony on the grounds that his opinions are not based on any literature or peer reviewed articles and, under the ruling in *Scottoline v. Women First et. al.*,[36] the testimony must be excluded.

The Court has reviewed the deposition transcript of Dr. Mena-Hurtado. Any fair reading of that transcript can lead to only one conclusion - that Dr. Mena-Hurtado was all over the place on his definition of the standard of care and was at times inconsistent. But as Defendants admit in their motion papers, at one point Dr. Mena-Hurtado did couch his opinions within the proper definition of standard of care.[37] As the doctor did at one point rely on the proper standard of care, I am not going to exclude his opinions at this point. However, at trial a foundation will have to be established by Plaintiff that Dr. Mena-Hurtado's opinions are based on a definition that is in accordance with 18 *Del.C.* §6853 and §6854. If Dr. Mena-Hurtado's opinions at trial are not consistent with this definition, they will be excluded.

---

[34] D.I. 84, Ex. A (Dep. of Dr. Carlos Mena-Hurtado), at p. 14-15, 150-152.
[35] D.I. 82, 84, 92.
[36] *Scottoline v. Women First, LLC*, 342 A.3d 373 (Del. 2025).
[37] *See* D.I. 84, at 7-8.

Defendants maintain that the recent Delaware Supreme Court decision in *Scottoline* requires that in medical negligence cases, for an opinion on causation to be reliable under this state's *Daubert* framework, the opinion must be based, in part, on medical literature and / or studies. Thus, Defendants argue where there is no such support the opinion as a matter of law is not reliable and is therefore excludable. There is no question that Dr. Mena-Hurtado clearly stated that he did not rely on medical literature and/or studies in support of his opinion.[38] The question is whether Defendants reading of *Scottoline* is correct. I think not.

*Scottoline* involved a pediatric neurologist who was asked to give a causation opinion on whether hypoxic-ischemic encephalopathy caused a child's later neurological and behavioral impairments. In excluding this opinion, the Court wrote the following:

> Dr. Adler is an accomplished pediatric neurologist with impressive credentials and years of experience diagnosing pediatric neurological conditions. Yet "[t]he ability to diagnose medical conditions is not remotely the same ... as the ability to deduce ... in a scientifically reliable manner, the causes of those medical conditions." "For most physicians, attributing background causation is not part of their normal practice." A physician "may testify to both, but the reliability of one does not guarantee the reliability of the other." Dr. Adler's expertise diagnosing neurological conditions or diseases does not guarantee expertise with etiology. When expressing a causation opinion, Dr. Adler was required to demonstrate that the etiology opinion he deduced – J.S.S.'s HIE caused his ASD – was reliable.

---

[38] Dep. of Dr. Carlos Mena-Hurtado, at p. 98-99, 176.

Dr. Adler failed to show that his etiology opinion had a scientific basis. Although he cited medical literature, he agreed that the medical literature he relied on suggested only an *association* between brain injury and autism – meaning, "related to each other but not necessarily linked in terms of cause." He was not aware of any published medical studies or literature demonstrating that HIE causes ASD. Dr. Adler also failed to reference personal experience in deducing etiologies. **Without academic literature or etiological experience** demonstrating that HIE can cause ASD, Dr. Adler's expert opinion lacked a scientific basis and was therefore inadmissible.

The Scottolines maintain that Dr. Adler's HIE-ASD causation opinion was still reliable because his third report used the "magic words" "differential diagnosis," thereby employing a reliable methodology. As explained earlier, however, the issue is not with Dr. Adler's *diagnosis* but with his *etiology* opinion that HIE caused ASD. The "process-of-elimination" method by which an expert demonstrates causation is more precisely called a differential etiology. A differential etiology requires the expert to rule in plausible causes for a diagnosis and rule out alternative causes.

Once again, Dr. Adler failed to demonstrate that his opinion was reliable. He acknowledged that there are a "whole host of potential causes" for ASD, but did not adequately rule out other known causes. …. At bottom, Dr. Adler did not perform a differential etiology for J.S.S.'s ASD diagnosis. By not attempting to rule out other possible causes, Dr. Adler did not apply a reliable methodology to support his causation opinion.[39]

The teaching of *Scottoline* is clear. For the opinion of an expert in a medical negligence case as to causation to be reliable under *Daubert*, the opinion must be based in part on academic literature, etiological experience or on a differential

---

[39] *Scottoline v. Women First, LLC*, 342 A.3d 373, 381-83 (Del. 2025) (footnotes omitted) (emphasis added).

diagnosis that rules out alternative causes. At this point, the record is not clear on whether Dr. Mena-Hurtado can meet the etiological experience or differential diagnosis reliability standard. The Court will allow Plaintiff to *voir dire* Dr. Mena-Hurtado during trial outside of the jury's presence to see if he can meet one of these two requirements. The testimony will not go to the jury if Plaintiff cannot establish one of these two points or provide medical literature to support his conclusion.

### 6. Defendants' Motion in Limine to Preclude Speculative Causation Testimony and Motion for Summary Judgment

All Defendants have filed a Motion in Limine arguing that Plaintiffs' experts causation testimony is speculative and, accordingly, the Court should grant Motion for Summary Judgment in favor of all Defendants.[40] Defendants argue that Plaintiffs' experts, Dr. Gore and Dr. Mena-Hurtado, testified that they could not say what course of treatment would have followed the catheterization and without that testimony Defendants are entitled to summary judgment. Defendants also maintain that whatever treatment choice that would have been elected could not have been performed before Mr. Kilroy's death, which is another basis for summary judgment.

A review of the plaintiffs' experts testimony is necessary. First, the testimony is clear from both experts that the standard of care required that the catheterization be done within 24 hours of admission.[41] Plaintiff was admitted to the hospital on

---

[40] D.I. 79, 87.
[41] Dep. Of Dr. Joel Gore, at p. 67-69.

12

May 2, 2021 at 7:37 p.m.  He first saw Dr. Popescu on May 3, 2021 at 9 a.m.  Dr. Gore testified that it was a breach of the standard of care not to have the catheterization done by sometime on May 4, 2021.[42]  The allegation is that either Dr. Popescu did not appreciate the seriousness' of the situation and the timing on when the catheterization needed to be done when she first saw Decedent, or that she was not aggressive enough with the catheterization lab to get the catheterization completed within the time frame required by the standard of care. Plaintiffs' expert Dr. Mena-Hurtado testified in his deposition that the cardiac catheterization should have been performed within 24 hours.[43]

All agree that the cardiac catheterization is a diagnostic procedure the results of which would have directed what further course of treatment Mr. Kilroy should have received.[44] Both experts testified that revascularization would have been required, but what type of revascularization would have been needed would have been driven by the results of the catheterization.  As a result, the lack of the cardiac catheterization makes it impossible to now determine what should have been done. However, according to Plaintiffs experts, had they known how to proceed,

---

[42] *Id.*
[43] Dep. of Dr. Carlos Mena-Hurtado, at p. 30: 18-22.
[44] Dep. of Dr. Joel Gore, at 74:20-75:7.

revascularization would have occurred and the Decedent more likely than not would have survived.[45]

The fact that Plaintiff has not presented evidence as to what subsequent treatment would have been rendered is not fatal to Plaintiffs' claim. What Plaintiff must provide as part of his prima facia case is that if the catheterization was done no later than sometime on May 4, 2021, something could have been done to prevent Decedent's demise on May 5, 2021. Plaintiff has presented testimony meeting this burden.

Dr. Gore indicated at his deposition that it was his opinion that if Mr. Kilroy had the catheterization within 24 hours, he would have received appropriate intervention and/or CABG which would have prevented his death.[46] Dr. Gore followed up this testimony with the following response to a question:

> A. If he had had the cart – heart catheterization done, they would have known the coronary anatomy, and some intervention would have been done, whether it was to change his medicine, to put him in the intensive care unit, to put him on intravenous medications, to do, as – as I said, a number of – of things. It's not just a procedure.
>
> The cath would have been provided the knowledge that all the clinicians caring for the patient, and the patient himself would have needed to guide the next decision in his treatment plan.[47]

---

[45] Dep. of Dr. Mena-Hurtado, at p. 89-90 ("he needed to be revascularized. And he had [sic] been revascularized, more likely than not, he would have survived his index admissions. The fashion in which he needs [to be] revascularized is difficult to entertain because a critical procedure was not performed in a timely fashion.").
[46] Dep. of Dr. Joel Gore p. 35-36.
[47] Dep. of Dr. Joel Gore, at p. 74-75.

The testimony that Defendants point to in support of their motion all involve questions about potential stenting versus a bypass surgery.[48] Defendants make a point that either stenting or bypass surgery would not have been possible. Despite Defendants' attempt at deposition to convince Dr. Gore that neither of these procedures could have been done by the time of Decedent's death on May 5, at no point did Dr. Gore move off his statement on causation. In none of his answers to Defendants' deposition questions did he ever waver from his opinion that a timely catheterization would have resulted in revascularization and allowed Mr. Kilroy to survive. He was never questioned or challenged about his conclusion that movement to the ICU or a change in his medication could have given him more time to accomplish a stent or bypass procedure. He was also not challenged about his conclusion as between the two, stenting or bypass surgery, more likely than not the procedure would have been bypass surgery. While Dr. Gore's testimony might not be convincing to a jury, Plaintiff has nonetheless presented sufficient evidence to get to a jury.

The evidence presented by Dr. Mena is similar. Dr. Mena testified that Dr. Popescu breached the standard of care because of her failure to understand the high risk features that the patient exhibited on presentation that would require an aggressive approach that she did not take.[49] Dr. Mena also opined that had Kilroy

---

[48] Dep. of Dr. Joel Gore, at p. 75-84.
[49] Dep. of Dr. Carlos Mena-Hurtado, at p. 12-13.

undergone the catheterization, he would have received the appropriate intervention which would have prevented his cardiac arrest and death.[50] Dr. Mena also confirmed that the results of the diagnostic catheterization would have provided the answer to what procedure, stent versus bypass, would have occurred next.[51] Further, Dr. Mena testified that revascularization was necessary, and had he been revascularized Kilroy would have survived his admission.[52] Dr. Mena agreed that based on Mr. Kilroy's condition, a second interventional step, either a bypass or the implementation of a stent, needed to be completed after the diagnostic catheterization. Dr. Mena did not say that the second intervention could not have been done in time; in fact, he made it quite clear if Decedent needed immediate surgery there is no reason it could not have happened.[53] Given his opinion that had the first catheterization been done timely, and viewing the evidence in a light most favorable to the plaintiff, I conclude that Plaintiff has presented evidence that a second intervention could have been done timely.

Dr. Mena ultimately concluded that he if had to pick which of the two procedures was more likely, it would have been the stent.[54] This conclusion was based on the location of the LAD lesion.[55] Mena also clearly testified that had the

---

[50] Dep. of Dr. Carlos Mena-Hurtado, at p. 14-15, 150-152.
[51] Dep. of Dr. Carlos Mena-Hurtado, at p. 89-90.
[52] Dep. of Dr. Carlos Mena-Hurtado, at p. 89-90.
[53] Dep. of Dr. Carlos Mena-Hurtado, at p. 157-160.
[54] Dep. of Dr. Carlos Mena-Hurtado, at p. 96.
[55] Dep. of Dr. Carlos Mena-Hurtado, at p. 93.

catheterization been done within the required time period, either a stent or bypass could have been done.[56] Defendant calls this testimony speculative. I call it a difference of opinion raising a question of fact that is for the jury to determine.

Defendants further argue that they are entitled to summary judgment because the plaintiff does not have an expert cardiothoracic surgeon to testify that a bypass surgery could have been accomplished between the time that the catheterization should have been done and the time of Mr. Kilroy's death. CCHS has produced such an expert. Defendants argue that a prima facia case requires an expert cardiovascular surgeon to say that a bypass could have been timely done and they have no such expert. Both of Plaintiffs' experts have testified that either a stent or bypass could have been done in time.[57] It is not necessary for Plaintiff to have a cardiovascular surgeon to say this. This issue is well within the field of either a cardiologist (like Dr. Gore) or an interventional radiologist.[58] Since Gore and Mena have testified that revascularization would have been timely, a fact issue remains for the jury to consider on this causation issue.

This Court is satisfied that Plaintiffs have provided sufficient causation evidence for a jury to consider whether Defendants' omissions caused the Decedent's death.[59]

---

[56] Dep. of Dr. Carlos Mena-Hurtado, at p. 152-160.
[57] Dep. of Dr. Carlos Mena-Hurtado, at p.152-160; Dep. of Dr. Gore, at p. 35-36.
[58] . *Robinson v. Reg'l Hematology & Oncology, P.A.,* 2018 WL 2186700, at *5 (Del. Super. Ct. May 8, 2018).
[59] *Green v. Weiner*, 766 A.2d 492, 495–96 (Del. 2001) ("[Plaintiffs] are not required to provide uncontradicted evidence of the elements of their negligence claim. Instead, the [plaintiffs] must provide credible evidence of each of these

17

Accordingly, this Motion in Limine and Motion for Summary Judgment is **DENIED**.

### 7. Defendants Regional Medical and Dr. Popescu's Motion in Limine to Preclude Speculative Testimony of Sarang Mangalmurti, M.D.

Defendants Regional Medical and Dr. Popescu filed a Motion in Limine to preclude Dr. Mangalmurti's testimony as to whether a catheterization would have been performed at Dr. Popescu's insistence. Dr. Mangalmurti is an interventional cardiologist presented as an expert for co-defendant CCHS. The moving Defendants do not challenge Dr. Mangalmurti's expertise. Instead, they challenge his assertion that the interventional cardiologist at CCHS would have completed the cardiac catheterization if Dr. Popescu insisted that it occur as speculative because, as acknowledged by Dr. Mangalmurti, he is not familiar with their relationship. Thus, Defendants raise issues pertaining to Delaware Rule of Evidence 702, 703, and 403. Plaintiffs oppose arguing any uncertainty goes to weight and not admissibility.[60]

In *O'Riley v. Rodgers*, the Delaware Supreme Court stated, "[a] doctor cannot base his expert medical opinion on speculation or conjecture."[61] The Court has also separately recognized that "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is for the opposing party to

---

elements from which a reasonable jury could find in their favor. So long as Dr. Kahn's testimony provides this minimal evidence, any inconsistencies in Dr. Kahn's testimony must be resolved by a jury.").

[60] D.I. 76.

[61] *O'Riley v. Rogers*, 69 A.3d 1007, 1011 (Del. 2013) (citing *Oxendine v. State*, 528 A.2d 870, 873 (Del. 1987)).

challenge the factual basis of the expert opinion on cross-examination."[62]  However, expert testimony should be excluded "[w]hen the expert's opinion is not based upon an understanding of the fundamental facts of the case."[63]

When asked whether the catheterization would have occurred had Dr. Popescu "insisted," Dr. Mangalmurti's answer was "I can't answer that because I don't know of the relationship between Dr. Popescu and her interventional cardiologist.  I would imagine that just out of sheer professional courtesy, if she insisted on it, the interventionalist . . . would have done it.  But I can't say that for sure."[64]  It appears to the Court that this opinion should not be excluded.  First, it was based upon an understanding of the facts of the case at hand.  Second, this opinion is not based on speculation or conjecture, but rather on his own professional experiences.  Dr. Mangalmurti is an interventional cardiologist who performs 15-20 catheterizations per week, and he performs them on both his patients and those of other physicians in his medical group.[65]  Defendants also do not challenge his qualifications or experience.  Third, the opposing party will have the opportunity to cross-examine Dr. Mangalmurti as it sees fit.

---

[62] *Perry v. Berkley*, 996 A.2d 1262, 1271 (Del. 2010) (citing *Porter v. Turner*, 954 A.2d 308, 313 (Del. 2008)); *see also Minner v. Am. Mortg. & Guar. Co.*, 791 A.2d 826, 858 (Del. Super. Ct. 2000) ("any defect in her diagnostic method is best cured by cross-examination.").

[63] *Id.* (citing *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 544 (8th Cir. 2006)).

[64] D.I. 76, at 2 (citing Ex. A, Dr. Mangalmurti's Dep. Transcript, at 80).

[65] Dep. of Sarang S. Mangalmurti, M.D., at 6-9.

As to the DRE 403 challenge, the Court does not see how this statement would mislead the jury or be unfairly prejudicial. Dr. Mangalmurti sufficiently couched this statement by stating he was not aware of the relationship between the two and that he "can't say that for sure." Any issues relating to the uncertainty of the statement are for the jury to weigh.

Accordingly, this Motion in Limine to preclude Dr. Mangalmurti's opinion is **DENIED**.

## 8. Defendants' Motion to Limit the Testimony of Dr. Joel Gore

Plaintiffs have proffered Dr. Joel Gore as an expert on the standard of care and causation. Dr. Gore is a cardiologist. All Defendants seek to limit his standard of care opinion since he has no knowledge of the relevant standard of care in Delaware and for a lack of knowledge as to the operations of the relevant catheterization lab within which Decedent was scheduled.[66] Plaintiffs oppose.[67]

In support of their motion Defendants cite to the following deposition testimony of Dr. Gore: "She should have gone down to the catheterization lab and spoken to whoever is the doctor on call -- who is -- who is there. And I don't quite know how Christiana works, but I would have talked to anybody and everybody that was there."[68] When questioned about the standard of care, Dr. Gore said, "I don't

---

[66] D.I. 74, 91.
[67] D.I. 97.
[68] Dep. of Dr. Joel Gore, at 83-84.

know what the standard of care in Delaware is, but my standard of care would be the patient could have what I refer to as bathroom privileges, but they would be staying very close, and I would have the person ambulating."[69] Gore then confirmed again that "I don't know the standard of care in Delaware"[70] and, as to the lab, "I don't know anything about how it runs."[71]

While at one point in time the Delaware medical malpractice statute had a "locality" rule requiring an expert to be "familiar with that degree of skill ordinarily employed in the community or locality where the alleged malpractice occurred," the locality rule was eliminated from 18 *Del. C.* §6854 in 1996.[72] Since then, the medical malpractice statute requires that an expert be "familiar with the degree of skill ordinarily employed in the field of medicine on which he or she will testify."[73] This Court's review of Dr. Gore's deposition transcript leads me to conclude that at this stage of the proceedings Dr. Gore has demonstrated that he is familiar with the standard of skill ordinarily employed in the field of medicine on which he will testify. The fact that Dr. Gore is not familiar with the standard of care in Delaware in and of itself does not bar his testimony pretrial.

---

[69] *Id.* at 93.
[70] *Id.* at 94.
[71] *Id.* at 100.
[72] *Tyler v. Albert Dworkin, M.D., P.A.*, 747 A.2d 111, 124 (Del. Super. Ct.), *aff'd sub nom. Tyler v. Dworkin*, 741 A.2d 1028 (Del. 1999).
[73] *Id.*; 18 *Del. C.* § 6854.

21

Dr. Gore's testimony on liability is that Dr. Popescu should have been more assertive in dealing with the catheterization lab to get Mr. Kilroy a catheterization quicker. That opinion does not require that Dr. Gore have knowledge of how the specific catheterization lab at Christiana Care functions on a day-to-day basis. Whether the lab could have handled a more urgent request from Dr. Popescu does not go directly to the basis of Dr. Gore's opinion, which again is that Dr. Popescu should have acted more urgently than she did. How the catheterization lab would have reacted to a more urgent request does not make Dr. Gore uninformed. On this basis, the motion is **DENIED**.

### 9. Plaintiffs' *Daubert* Motion to Exclude the Testimony of Dr. Argenziano

Plaintiffs have moved to exclude the testimony of Dr. Michael Argenziano as to any opinions with respect to liability.[74] Dr. Argenziano is a cardiothoracic surgeon. The briefings of the parties on this issue have focused on whether Dr. Argenziano is qualified as a cardiothoracic surgeon to opine on the standard of care of a cardiologist. The briefing misses the mark. In his deposition, Dr. Argenziano clearly indicated that he was not offering any liability opinions regarding the standard of care as to the cardiologist involved in this case, the interventional cardiologist, the catheterization lab or the folks who were running it.[75]

---

[74] D.I. at 78.
[75] Dep. of Dr. Michael Argenziano, at 13-15.

On this basis alone, Plaintiffs' motion is **GRANTED**. To be clear, Dr. Argenziano will be permitted to testify as to his causation opinions. This testimony can include testimony that any bypass surgery could not have been completed in time even if the catheterization had been performed in the time window offered by the plaintiffs' experts on this point.

### 10. Plaintiffs' Motion in Limine to Exclude the Testimony of Dr. Mangalmurti and / or Dr. Klugherz as Cumulative

Plaintiffs have moved in limine to exclude the testimony of Dr. Mangalmurti and/or Dr. Klugherz.[76] These two doctors are both interventional cardiologists and have been identified as experts on behalf of Christiana Care. According to Plaintiffs, their reports and depositions make it clear that their opinions are identical and, as such, the testimony is cumulative and one of the doctors should be prevented from being called. Christiana Care responds that the two doctors' testimony is not entirely identical, and even if they were calling two experts on the same topic is not cumulative as a matter of law preventing the calling of one of these two experts.[77]

The fact that evidence is cumulative does not necessarily make it inadmissible.[78] The Delaware Supreme Court has held that "while a trial judge may limit a party's presentation of evidence on the ground that it is cumulative, such

---

[76] D.I. 77.
[77] D.I. 93.
[78] *Barrow v. Abramowicz*, 931 A.2d 424, 430 (Del. 2007).

23

authority should be exercised sparingly so as not to deprive a litigant of the right to manage the presentation of her evidence."[79]

Calling two expert witnesses whose testimony overlaps in a medical negligence case is not a situation where this Court should intervene to deprive a litigant of a right to manage the presentation of their evidence. The Court will deny the motion at this time. But if during the trial it becomes clear that the testimony is identical and is not being of assistance to the jury, the Court, upon a motion from a party, will revisit the issue. For now, Plaintiffs' motion is **DENIED.**

### 11. CCHS' Motion in Limine to Preclude Evidence or Argument relating to the Clinic, Dr. Innasiuthu and Lauren Zastrow

CCHS has filed a motion in limine to preclude any party from presenting any evidence or argument that the Heart and Vascular Clinic, Dr. Leslie Innasiuthu or Lauren Zastrow, PA-C were negligent. This motion is unopposed. Therefore, it is **GRANTED**

**IT IS SO ORDERED.**

*/s/ Francis J. Jones, Jr.*
Francis J. Jones Jr., Judge

cc:    File&ServeXpress

---

[79] *Green v. Alfred A.I. duPont Inst. of Nemours Found.*, 759 A.2d 1060, 1065 (Del. 2000); *see also Galmore v. St. Francis Hosp.*, 2011 WL 2083888, at *2 (Del. Super. Ct. Apr. 27, 2011); *DeBussy v. Graybeal*, 2016 WL 8379211, at *1 (Del. Super. Ct. Dec. 2, 2016); *Kent v. The Dover Ophthalmology ASC., LLC*, 2018 WL 1151930, at *7 (Del. Super. Ct. Mar. 2, 2018).